# CHARLESTON.

State *v.* George Caldwell *et al.*

(No. 6439)

Submitted November 6, 1929. Decided December 10, 1929.

*Wolverton & Ayers,* for plaintiff in error.

*Emmett Horan,* Prosecuting Attorney, *Howard B. Lee,* Attorney General, and *W. Elliott Nefflen,* Assistant Attorney General, for the State.

Litz, Judge:

The defendants were found guilty in the second degree of the murder of Luigi Parvonni and sentenced to eighteen years confinement in the penitentiary. They contend that the evidence does not (a) connect them with the death or (b) show that it was caused by a criminal agency.

Parvonni was an Italian who, for several years, had been

employed by the Cherry River Boom & Lumber Company in Pocahontas county and occasionally visited Richwood, Nicholas county. On the afternoon of December 23, 1927, he came by train from his place of work to Richwood in company with Joe Vitelli, an Italian merchant of Richwood, from whom he was accustomed to purchase merchandise; arriving about 6:30. Vitelli testified that on their way to Richwood Parvonni offered to pay him a store account of one hundred and thirty or forty dollars, but Vitelli not having with him a statement thereof, he told Parvonni to come to his place of business that night or the next morning and pay the acount. Ray Arbogast testified that about eight or nine o'clock defendant, George Caldwell, pointed Parvonni out to him as having had a thousand dollars about a year before that time, and said "if he could get him in a car we could get the money." The witness said he replied that he did not "need the money." R. L. Weatherbee and Ruby Young each testified to seeing Caldwell nod to Parvonni in a dance hall about ten o'clock, and that Parvonni went out with Caldwell. Weatherbee smelled liquor on Parvonni. M. D. Laughlin, hotel clerk of the Northern Hotel, testified that Parvonni registered at the hotel about 10:45; that, paying for his room in advance, Parvonni produced at least two five-dollar bills and a ten-dollar bill and three ones; that Parvonni was drinking, and, upon being informed that the hotel closed at twelve, left, saying he would return in a "little bit". E. F. Luzier saw both defendants and Parvonni going up Main Street about midnight. Parvonni was staggering "a little bit" and was about 100 yards ahead of Caldwell and Chambers. Henry Juergens saw the three at twenty-five minutes of one o'clock. Parvonni was then in the doorway of Murray's Hall, Caldwell was in front of the post office and Chambers, who "was pretty full" was walking down the street. The exact proximity of the three is not shown, but as Juergens "kept on going" he heard Caldwell say "come on", and the three then moved down the street. Juergens said Parvonni "was kind of slow" and that all of the three looked like they had been drinking. J. O. Armstrong, a policeman, saw Parvonni pass the city hall on Main Street about 12:30, followed at a dis-

tance of about thirty feet by the defendants; Parvonni then sat down on a bench in front of the Northern Hotel and the two defendants sat down beside him; after sitting a while the three went some distance down the street together, then separated, Parvonni returning to the hotel and the defendants going down Oakwood Avenue; later between 1:30 and 2:00, he saw the three in an alley near the avenue standing at the rear of a Ford car which John Goff had been driving. John Goff testified that he was driving the car that night as a taxi; that about one o'clock, on Oakwood Avenue, the two defendants and Parvonni asked him to take them down to Saxman (a small mining town some miles from Richwood), which he did; that Parvonni gave Caldwell a ten-dollar bill on the trip to get some liquor, at which time he observed other bills of money in Parvonni's pocketbook; that Caldwell purchased a quart of whiskey en route, of which they all drank; that because Caldwell and Parvonni were quarreling on the way back to Richwood, he had Parvonni ride in the front seat with him; that when they reached the "junk pile", "around two or two-thirty"; about two hundred and fifty yards from the place where Parvonni was later found, defendants and Parvonni left the car and started up the road toward Richwood; that he drove away in another direction, last observing the three going up the road together in the direction, and about 150 yards of the place where Parvonni was later found. Mrs. Nellie McCourt, who lived some fifty feet from where Parvonni was found, testified that about 2:30 that morning she heard a person run across the porch, go to the well and pump water; also heard someone talking.

At about three o'clock, Farrell Mealey and Herbert Kraft, while driving a Chevrolet sedan automobile (weighing about 2400 pounds) down a hill on the main street in the city of Richwood on their way to work, observed an object twenty to twenty-five feet ahead, near the center of the paved way, which was covered with ice and snow packed hard by passing vehicles. The brakes were promptly applied, but the wheels skidded and the driver was unable to prevent the car from passing over the object. In the opinion of Mealey and Kraft, the wheels did not touch it, but some underpart of the car

did, as was evidenced by a slight jolt. The car was running at from twenty to twenty-five miles an hour when the object was first discerned and was brought to a stop about twenty feet beyond. Mealey and Kraft went back to the object after stopping the car and found it to be Parvonni. He was lying on his back with his head down grade, practically parallel with the sides of the road. He did not speak and was breathing heavily. Fumes of liquor were on his breath. He was bleeding slightly, and a stream of blood from two to four inches in width had flown from his head down over the snow a distance of about eighteen inches. His clothing was "ruffled up" from his belt and his coat "kind of frosted" to the ground. Mealey and Kraft picked him up, and as they did so, the entire scalp fell backward from the top of his head. They placed Parvonni in their car and rushed him to a hospital. He bled a small quantity on the way.

Dr. C. F. Fisher examined Parvonni at the hospital in about one-half an hour after Mealey and Kraft found him. The doctor testified concerning the examination as follows: "When this man was seen by me he was fully dressed, with the exception of his hat, which was later found and brought in, there being no marks about the hat, or bloodstains. The man was profoundly unconscious, breathing heavily and could not be aroused. The odor of whiskey was upon his breath. There was a tear in the right knee of the trousers over the patella, there (indicating), and a triangular tear in the back of the coat and sweater just below the collar of each and between the shoulders. That would be about right there (indicating). There was also a tear in the right sock, corresponding to a wound on the ankle. That would be there (indicating). Examination of the head disclosed the following: Pupils of his eyes were unequal and contracted. There was no blood in the ears or nose. There was an abrasion, just a small wound, over the left eye, two and a half inches long, right here (indicating). The scalp in a semi-circular or half-moon manner, was cut through its entire thickness, the convexity being forward, this way (indicating). This flap of scalp was stripped from the skull and turned backwards, leaving the skull itself bare. In the occipital region,

the back of the head, there was one laceration or cut, entirely through the scalp, three and a half inches long. There was also a laceration or cut two and a half inches long immediately over the mastoid process, on the left side, just behind the ear. There was a linear fracture, or fracture in a straight line, of the skull at the top, extending from before, behind, one and half inches. There was no evidence of depression. That is, the bone was not driven in. The left collar-bone was fractured, and to such an extent that reduction was absolutely impossible; that is, we couldn't set the bone. I will have to use a medical term here, and I will change it. The internal and external condyles of the right humerus— that is the elbow, inside and outside of the elbow—were fractured, and the arm fixed in flexion, this way (indicating), and could not be extended. There was also a compound fracture of the right internal melleolus of the leg, right here (indicating). This ankle bone was broken off, and a tear in the leg. His blood pressure was unobtainable, and there was no pulse at the wrist, and his body was cold, being in a state of extreme shock. His condition with treatment, including treatment for the shock, availed nothing, and he rapidly went down, dying at five-thirty P. M. This man never regained consciousness while in the hospital, and made no statement. * * * I believe that the direct cause of this man's death was the fracture of the skull, and that the other injuries simply hastened his end.'' Dr. Fisher further stated that Parvonni bled very slightly at the hospital, and that, judging from the small amount of hemorrhage there, he was of opinion that the injury to the head had occurred an hour before the examination. The doctor was also of opinion that a car striking a man could have produced all the injuries inflicted on Parvonni; that the fractures of the shoulder-blade and ankle were due to ''force-pressure''; that the removal of the scalp was due to ''indirect violence—a glancing blow''; that had Parvonni been struck with a billy or club over the head with sufficient force to have produced the injury to his scalp, the blow would have fractured the skull; and that if the Chevrolet had torn the scalp loose he saw no way in which the scalp could replace itself as it was when first observed by

Mealey and Kraft. The doctor examined the underparts of the Chevrolet and found no hair or bloodstains. By his measurements the front axle was 10½ inches and the differential 9½ inches off the ground. He stated that Parvonni weighed about 185 pounds, and that his skull from back to front would measure about ten inches. The doctor performed a post-mortem on Parvonni and found that the tissue of the brain was undamaged, and that there was no external evidence of a blow about the fracture. "The fracture was a simple break of the bone, without any evidence of being driven in at all", the witness stated, and was of opinion that the fracture could have been produced by pressure on the head. In cases of simple fracture, he said, the force ("the push") would have to be directly inflicted upon the portion fractured; and that it was "reasonable to suppose" that a blow right over the portion of the skull that was fractured would leave some outside evidence. Apparently realizing, from the position of the body and the location of the fatal wound on the back of the head, the improbability that it had been caused by direct contact of the automobile, counsel for the defendants propounded the following question: "Doctor, would not pressure on the front of the head and against it, if the back of the head was lying on the pavement, have produced that fracture? Could it not have been produced in that way?" To which Dr. Fisher responded: "That is called a bursting fracture, and the fracture would have been larger and it would have gone through all the tables of the skull."

Dr. Fisher, in detailing the articles found on the person of Parvonni, stated further: "There was one bill-fold from the sock of the right leg, containing identification card and three checks (aggregating in amount two or three hundred dollars), and insurance certificate. We found that when we were examining the wound in the leg and removing his clothing. A Waltham watch was removed, still running; eighty-four cents in change; two sets of cuff links; one box of matches, a pencil and some keys; a time-book; three photographs, one of himself; a store bill from a local store, and a lodge receipt."

The witness, Ray Arbogast, testified also that when he informed the defendant, Caldwell, of Parvonni's death, a few hours thereafter, Caldwell, in the presence of the witness, instructed his brother to tell Chambers "to keep his mouth shut." Both defendants denied being with Parvonni on·the night that he received his injuries and both stated that they had gone to the home of Caldwell's mother about midnight and had remained there the rest of the night. Their statements in this respect were confirmed by Mrs. Caldwell. The defendant, Caldwell, denied any of the damaging remarks attributed to him by the witnesses.

It appears that Goff was a paroled convict and that Arbogast had made an affidavit at variance with his testimony, but the credibility of the witnesses was a question for the jury. The evidence that Caldwell schemed to get Parvonni's money, that both defendants dogged him for several hours; that they were seen in his company·within a few minutes before and within a short distance from where he received his injuries, and that when found his money was gone, abundantly connects them with the injuries if criminally administered. It is apparent that the car of Mealey and Kraft caused only a part, if any, of the injuries. The injury to his head had evidently been inflicted about one-half of an hour before Mealey and Kraft found him. The mode in which the injuries were inflicted can only be surmised, but it was not incumbent on the state to show with exactness the "manner and means" thereof. 30 C. J., p. 287, sec. 531; *Com.* v. *Webster*, 5 Cush. (Mass.) 294, 52 A. D. 711; *Com.* v. *Cutaiar*, 5 Pa. Dist. 403, 409-10. Whether the fatal wounds were inflicted by the defendants or whether they left the deceased in a helpness condition in the pathway of automobiles, after assaulting him, and he was later struck by some "hit and run" automobile, is of little importance before the complete picture portrayed by the evidence. From that picture it appears that the defendants planned to and did rob Parvonni. In order to do so they would naturally render him helpless. If, after the assault and robbery, they left him helpless where it was reasonable to expect that he would be struck by an automobile and he was so further injured, they are just as

guilty as if they had directly inflicted all the injuries. 20 C. J., p. 1096-7. It is the law generally that the *corpus delicti* may be established by circumstantial evidence. 30 C. J., p. 284-5, sec. 529; 13 R. C. L., p. 737-8, sec. 41. Of course, the proof in such case must be clear and cogent and establish the fact beyond reasonable doubt. Wharton's Cr. Law, 11th Ed., sec. 353. *Com.* v. *Webster,* cited. Under no reasonable hypothesis arising from the evidence can the defendants be exonerated from a felonious connection with the injuries received by Parvonni.

The judgment of the circuit court is accordingly affirmed.

*Affirmed.*